# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of: | No. 58745-9-II |
| LISA ANN MUELLER, | |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| ROLAND STEVEN MUELLER, | |
| Respondent. | |

CHE, J.—Lisa Mueller appeals the trial court's entry of final family law orders.

After Lisa petitioned for legal separation from Roland Mueller, the trial court entered a temporary family law order (TFLO) and parenting plan.[1] Later, Lisa and Roland entered a CR 2A settlement agreement.

Nine months later, Roland moved to present final orders. Lisa argued that Roland's proposed dissolution decree contained terms not agreed upon and that the agreed-upon parenting plan and child support order no longer served the best interests of the children. The trial court granted Roland's motion and entered Roland's proposed final orders.

---

[1] Because the parties share the same last name, we refer to them by their first names, no disrespect is intended.

On appeal, Lisa argues the trial court lacked authority to enter Roland's proposed final orders and abused its discretion by entering the final parenting plan and child support order. She also requests attorney fees and costs.

We hold that the trial court erred by entering Roland's proposed dissolution decree and final parenting plan but did not err by entering the final child support order. We also award Lisa attorney fees on appeal.

Accordingly, we affirm the child support order but vacate the dissolution decree and final parenting plan, and remand for further proceedings consistent with this opinion. While we affirm the final child support order, if the trial court finds it necessary to revise the order after entering a new parenting plan on remand, the trial court may do so.

FACTS

I. BACKGROUND AND TFLO

Lisa and Roland have three children. Two of the children, LKM and LNM, are minors. In 2022, Lisa filed a petition for legal separation from Roland. At that time, Lisa and Roland owned two homes, one in Washington and another in Kansas.

In May 2022, the trial court entered a TFLO. Among other things, the TFLO required (1) Roland to pay Lisa $6,000 per month in "undifferentiated spousal support", (2) Lisa to pay both mortgages, (3) the parties to sell both homes, and abstain from using any sale proceeds "without mutual agreement of the parties in writing, or order of the court", (4) Lisa to "take the lead in getting the homes on the market for sale", (5) and the parties to determine whether they could continue forbearance of both mortgages in the interim. Clerk's Papers (CP) at 30-31.

2

In its temporary parenting plan, the trial court reserved on making RCW 26.09.191 findings.[2] The plan's residential provisions granted primary custody to Lisa but granted Roland custody of the children every other weekend and every Thursday.

## II. CR 2A AGREEMENT

In November 2022, Lisa and Roland reached a settlement on "predominantly all of the issues" in the case and read their CR 2A agreement into the record. Rep. of Proc. (RP) (Nov. 21, 2022) at 4.

The agreement, in relevant part, (1) allowed Lisa to relocate with both children, either to Michigan or Kansas, (2) required Roland to pay Lisa $1,552 per month in child support and $3,000 per month in spousal support, (3) granted ownership of the Kansas home in full to Lisa, (4) required Roland to pay "back mortgage payments" on the Kansas home before the end of the month, and Lisa to reimburse him for half of the expense, (5) required Lisa and Roland to sell the Washington house and split any proceeds equally between the two of them, and (6) required Lisa to reimburse Roland for half of what he had recently paid on a HELOC from his 401(k) funds. CP at 76.[3]

The parties agreed on a proposed final parenting plan. That proposed parenting plan was not read into the record although the parties agree it was identical to the trial court's final parenting plan, entered nine months later. Aside from Roland's obligation to pay the outstanding

---

[2] RCW 26.09.191 governs mandatory and discretionary limitations on parenting plans based upon parental actions "contrary to the health and well-being of the parent's child," or which "create[] an unreasonable risk of harm to a child." RCW 26.09.191(1).

[3] Home equity line of credit (HELOC).

mortgage balance on the Kansas home before the end of the month, no time was provided for the beginning of the terms of the CR 2A agreement.

Lisa confirmed that the agreement reached on the parenting plan served the best interests of their minor children. The trial court found the agreement fair and equitable and agreed to sign consistent orders. The trial court informed Lisa and Roland that although they would not be legally divorced until final orders were entered, the CR 2A agreement was binding.

### III. FINAL ORDERS

Over the next nine months, the parties continued to follow the terms of the TFLO and temporary parenting plan. Although they exchanged several versions of proposed final orders, they were unable to agree on the final terms. In the meantime, Lisa fell behind on the Washington home mortgage payments which were approximately $3,000 per month.[4]

Additionally, in January 2023, Roland disciplined LNM by slapping LNM twice in front of LKM. Afterward, the children stopped seeing Roland. Roland became concerned that Lisa was influencing and encouraging the children to abstain from contact or visitation.

In August 2023, Roland filed a motion to present final orders or in the alternative, to enforce the temporary orders and parenting plan and to amend the temporary orders. He argued Lisa had missed multiple payments on the Washington home mortgage and HELOC, and that as a result, the couple owed a significant amount in outstanding payments.[5] He also argued Lisa was violating the temporary parenting plan because he had not seen LNM or LKM for an

---

[4] The record is unclear if this includes the monthly HELOC payment.

[5] Roland initially claimed the parties owed more than $13,000, and by the time he filed his reply, that amount apparently exceeded $16,000.

extended period of time. He discussed the January 2023 incident and disclosed a prior unrelated incident that had occurred decades earlier involving another of their children, now an adult. Apparently, Roland had disciplined the child by spanking them with a belt. CPS became involved, but no action was taken against Roland.

Roland requested that the trial court enforce the terms of the CR 2A parenting plan. He also requested that the trial court (1) require Lisa to pay the outstanding balance for the Washington home mortgage, (2) allow Roland to make all future mortgage and HELOC payments while deducting the payment amount from his $6,000 monthly undifferentiated support obligation, (3) begin enforcement of the CR 2A terms regarding child and spousal support after sale of the Washington home, and (4) grant him full access to the online mortgage account.

Roland argued that the mortgage company was requiring the couple to make a $9,412.24 lump sum payment on the outstanding mortgage balance. As a result, Roland argued the final orders needed to address how the mortgage and HELOC would be paid until the Washington home was sold. He argued that because the TFLO required Lisa to make those payments, it would be proper for the trial court to enter final orders continuing her obligation to make those payments. Because Lisa had missed several of those payments, Roland argued the trial court was required to adopt his proposed final orders allowing him to pay the mortgage while deducting the payment amount from his $6,000 monthly undifferentiated support obligation.

Lisa responded that the trial court should deny Roland's proposed final orders, and either enter her own proposed final orders or "set the parenting plan and child support for trial." CP at 110. She attached a declaration and an exhibit, appearing to show her personal understanding of the CR 2A agreement terms, to her response. Lisa alleged that the children feared Roland, and

Roland had a history of becoming easily agitated, yelling, and kicking or throwing things during arguments. She stated, "Roland's declaration makes it sound as if [the belt] incident and this recent one were the only two times he's ever laid his hands on the boys, or made them fearful for their safety but it is not, and I fear this won't be the last time." CP at 167.

Lisa argued the CR 2A parenting plan no longer served the best interest of the children and requested that the trial court add the following language into its residential provisions:

> Due to the use of physical discipline by the father toward the younger child, the children shall have a say in whether or not they participate in visitation with their father. The mother will encourage the children to participate but is not required to force them to see him.

CP at 112. She also argued she was entitled to an additional $400 per month in child support because, as a result of the January incident, she had custody of the children more often than anticipated.

Lisa agreed that she had missed several mortgage payments but argued that if the trial court granted Roland's request to deduct the mortgage payments from his $6,000 monthly undifferentiated support obligation, she would be unable to "survive and provide for [her] children." CP at 169. Additionally, Lisa listed the portions of Roland's proposed final orders which she believed did not align with, or were not included within, the terms of the CR 2A agreement. She argued the trial court had no discretion to enter final orders with material terms not agreed upon by the parties or decided in mediation. However, she argued that statute and case law granted the trial court authority to approve her requested deviations in the parenting plan and child support order. In Roland's reply, he listed the terms of Lisa's proposed final orders with which he disagreed or claimed the parties had never agreed upon.

At the hearing on the motion, Roland argued that his proposed final orders reflected the terms of the CR 2A agreement.[6] Relying on case law, Lisa argued the trial court had discretion to determine whether the parenting plan served the best interests of the children. She asked the trial court to consider her personal financial circumstances and award her additional child support. Roland argued that Lisa would have ample funds once she sold the Kansas home and characterized her request for increased child support as arbitrary.

The trial court expressed discomfort with the idea of signing final orders with terms differing from those of the CR 2A agreement. To the trial court, it made sense to sign orders consistent with the CR 2A agreement, and if the parties had issues with those terms, there was "a mechanism for that." RP (Aug. 18, 2023) at 41. At the same time, the trial court also acknowledged the parties were "entitled to have trials on issues that they didn't agree to." RP (Aug. 18, 2023) at 33.

Lisa argued that those mechanisms would be ineffective for her. To modify the final parenting plan, Lisa would be required to show a substantial change in circumstance between the time the order was signed and the motion to modify. In this case, there would be no change in circumstance because the trial court was aware of the January 2023 incident before the final orders were to be signed.

> THE COURT: Well, but it hasn't been fully litigated. I mean, the thing of it is, you know, you're—
> [LISA'S ATTORNEY]: Which is why I set it for trial. We set that issue for trial.
> THE COURT: Yeah, but it hasn't been— . . . I don't have the information in front of me, I don't think, to properly make a determination as to what happened in January. So, I mean, it's been raised. It's an allegation. . . . I don't know if I

---

[6] The beginning of the hearing is missing from the transcript in the record. The facts recounted here are based upon the portion we have.

have sufficient facts to make any particular finding about that, as opposed to you note a motion and say we need to, you know, we need to change this Plan, because this is what happened. But I hear what you're saying. Procedurally it's a problem but that, you know, we're nine months past the settlement.

RP (Aug. 18, 2023) at 42.

The trial court entered findings and conclusions about a marriage, a dissolution decree, a parenting plan, and a child support order, all in accordance with the terms of Roland's proposed final orders. The trial court described the basis for its findings and conclusions as "Spouses' agreement." CP at 242. In the final parenting plan, under "Reasons for putting limitations on a parent," citing to RCW 26.09.191, the trial court wrote, "Neither parent has any of these problems." CP at 217. The final child support order required Roland to pay Lisa $1,551.76 per month in child support, noting that neither party requested a standard deviation.

Lisa appeals.[7]

ANALYSIS

I. ENTRY OF FINAL ORDERS

Lisa argues the trial court lacked authority to enter final orders which did not reflect the terms of the CR 2A agreement. Although she acknowledges that the final parenting plan and child support order essentially reflect the terms of the CR 2A agreement, she argues the trial court erred by failing to consider her changed financial circumstances as well as the January incident before entering final orders.

---

[7] While her initial appeal was pending, Lisa apparently filed a CR 60(b) motion with the trial court, which the trial court denied. She then filed an amended notice of appeal, including that ruling. *See* Am. Notice of Appeal (Feb. 20, 2025). However, because she did not designate any record pertaining to that motion, we do not have the facts of that motion before us, and accordingly, we do not include it in our opinion.

A.      *Legal Principles*

CR 2A governs enforcement of a settlement agreement.  *Condon v. Condon*, 177 Wn.2d

150, 157, 298 P.3d 86 (2013).  CR 2A reads,

> No agreement or consent between parties or attorneys in respect to the proceedings
> in a cause, the purport of which is disputed, will be regarded by the court unless the
> same shall have been made and assented to in open court on the record, or entered
> in the minutes, or unless the evidence thereof shall be in writing and subscribed by
> the attorneys denying the same.

CR 2A.  "The purpose of CR 2A is to give certainty and finality to settlements."  *Condon*, 177

Wn.2d at 157.

We consider two criteria when determining whether an agreement is disputed under CR

2A.  *Fairway Collections, LLC v. Turner*, 29 Wn. App. 2d 204, 226, 540 P.3d 805 (2023).

"'First, there must be a dispute over the existence or material terms of the agreement, as opposed

to a dispute over its immaterial terms.'"  *Id.* (quoting *In re Marriage of Ferree*, 71 Wn. App. 35,

40, 856 P.2d 706 (1993)).  Material terms relate to the agreement's "'substance, gist, or legal

effect.'"  *Id.* (quoting *Ferree*, 71 Wn. App. at 40).  "'Second, the dispute must be a genuine one,'

meaning that the purpose of CR 2A is served by barring the enforcement of an alleged agreement

that is genuinely disputed, 'for such a dispute adds to the issues that must be tried.'"  *Id.* (quoting

*Ferree*, 71 Wn. App. at 40-41).

When a party moves to enforce a settlement agreement, that party bears the burden of

showing "'there is no genuine dispute over the existence and material terms of the agreement.'"

*Condon*, 177 Wn.2d at 162 (quoting *Brinkerhoff v. Campbell*, 99 Wn. App.  692, 696-97, 994

P.2d 911 (2000)).  In such cases, trial courts follow summary judgment procedures.  *Id.* at 161.

As a result, "[t]he parties' submissions must be read in the light most favorable to the nonmoving

party in order to determine whether reasonable minds could reach only one conclusion."

*Condon*, 177 Wn.2d at 162. If the moving party fails to meet their burden, or the nonmoving

party succeeds in showing a genuine dispute over material terms, the trial court must disregard

the agreement and set trial. *See Ferree*, 71 Wn. App. at 45. On the other hand, if the opposite is

true, the trial court is empowered to enforce the CR 2A agreement. *Id*. We review de novo a

trial court's order enforcing a settlement. *Condon*, 177 Wn.2d at 162.

RCW 26.09.070(3) describes the relationship between the terms of a settlement

agreement and a trial court's final orders:

> If either or both of the parties to a separation contract shall at the time of the execution thereof, or at a subsequent time, petition the court for dissolution of their marriage or domestic partnership, for a decree of legal separation, or for a declaration of invalidity of their marriage or domestic partnership, *the contract, except for those terms providing for a parenting plan for their children, shall be binding upon the court* unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties on their own motion or on request of the court, that the separation contract was unfair at the time of its execution. Child support may be included in the separation contract and shall be reviewed in the subsequent proceeding for compliance with RCW 26.19.020.

(Emphasis added.)

B.      *Dissolution Decree*

Lisa argues the trial court erred by entering Roland's proposed dissolution decree because

Roland requested terms that were either absent or different from those agreed upon at the CR 2A

agreement. She argues the trial court should have resolved any disputed terms before entry of a

final order. We agree.

Here, the trial court based its final orders' findings and conclusions upon the "Spouses'

agreement." CP at 242. Thus, those orders, which the trial court found to be fair (*see* CP at 243-

45), should have matched the terms of the CR 2A agreement. RCW 26.09.070(3). But that is not the case here. Roland represented his proposed orders reflected the CR 2A agreement, but Lisa demonstrated there were genuine disputes over the existence and material terms of the agreement, which Roland could not overcome.

For example, in Roland's proposed orders, the CR 2A agreement's spousal and child support obligation took effect after the couple sold the Washington home. Roland's proposed orders allowed him, in the interim before the Washington home sold, to pay the mortgage and HELOC directly and deduct the amount of his payment from the support obligation imposed by the TFLO. The TFLO ordered Lisa to pay the mortgages and Roland to pay Lisa $6,000 in undifferentiated support per month. The CR 2A required Roland to pay Lisa only $4,552 in spousal and child support per month, but it did not provide who would pay the Washington mortgage and HELOC obligations before the home sold and when the CR 2A support obligations would take effect.

By ordering Roland to pay Lisa the $6,000 undifferentiated support—minus the value of the HELOC and the $3,000 mortgage payment—in the dissolution decree, the trial court left Lisa with around $3,000 per month in support. This appears to be less than she would have received had Roland been ordered to pay her $4,552 per month, as the parties agreed in the CR 2A, and had Roland been responsible for the mortgage and/or HELOC until the Washington home sold. The dissolution decree imposed a delay of the CR 2A agreement's spousal and child support terms until sale of the Washington home, absent any such language on the face of the CR 2A

11

agreement.[8]  Further, the trial court delayed the CR 2A agreement's spousal and child support terms, even though it did not impose such a delay on the agreement's other terms.

Lisa also disputed Roland's assertion that she should be responsible for drafting and recording the deed for the Kansas home, that certain expenses she owed Roland must be drawn from her share of the Washington home sale proceeds, that the parties would participate in dispute resolution regarding personal property disputes, and that Roland was only obligated to pay child-related medical debts.

These terms were not agreed upon by the parties, nor were they settled at any type of mediation, evidentiary hearing, or trial.  The terms of the mortgage, HELOC, deed costs, and allocation of costs and support payments are material because they go directly to the "substance, gist, or legal effect" of the CR 2A agreement.  *See Fairway Collections, LLC*, 29 Wn. App. 2d at 226.  The trial court did not conduct an evidentiary hearing to resolve these disputed issues of material terms.  *See Brinkerhoff*, 99 Wn. App. at 696, 697 (explaining that we rely on summary judgment procedures where a moving party relies on affidavits or declarations in a motion to enforce a CR 2A agreement and when "there is an issue of material fact, the issue should be resolved by a fact-finding hearing").

As a result, the trial court entered a dissolution decree that added to or changed material terms the parties agreed to in the CR 2A agreement.  Roland fails to demonstrate that there is no

---

[8] Lisa argued below, and argues on appeal, that this portion of the final orders did not comport with the terms of the CR 2A.  However, she also argued below that the parties had agreed the CR 2A would not take effect—and final orders would not be signed—until the Washington home was sold.  Roland did not agree with Lisa on this issue.  The parties were not in agreement on the matter.

dispute over these material terms, and it was error for the trial court to include them in the dissolution decree without further inquiry.[9]

C.      *Final Parenting Plan*

Next, Lisa argues that although the final parenting plan adopts the terms of the CR 2A agreement, the trial court failed to exercise its discretion to consider the best interest of the child as well as RCW 26.09.191 before signing it, particularly in light of the January 2023 incident. We agree.

RCW 26.09.070(3) makes clear that parenting plans are treated differently: "the contract, except for those terms providing for a parenting plan for their children, shall be binding upon the court." When a couple enters a settlement agreement, the trial court must consider terms of the agreement pertaining to parenting plans, but the trial court is not bound by them. *In re Marriage of Grimsley-LaVergne*, 156 Wn. App. 735, 742, 236 P.3d 208 (2010) (published in part); *In re Marriage of Littlefield*, 133 Wn.2d 39, 58, 940 P.2d 1362 (1997); *In re Marriage of Thier*, 67 Wn. App. 940, 944, 841 P.2d 794 (1992). In other words, "[t]he agreement may be considered by the court, in light of the circumstances and knowledge of the parties when the agreement was made, but it is not enforceable." *Littlefield*, 133 Wn.2d at 58. Even when parties enter stipulations proposing changes to existing parenting plans, "the trial court must review the parties' proposed changes under the best interests of the child standard and approve or reject them." *In re Marriage of Coy*, 160 Wn. App. 797, n.7, 248 P.3d 1101 (2011) (citing to RCW 26.09.260(1), .070(3)).

---

[9] Roland moved in the alternative for enforcement of, and amendment to, the temporary orders. Because the trial court entered final orders, we do not consider whether it would have been proper for the trial court to enter amended temporary orders in this circumstance.

One of the objectives of permanent parenting plans is to "protect the best interests of the child consistent with RCW 26.09.002." RCW 26.09.184. RCW 26.09.002 requires that "the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities." We review best interest determinations in residential schedules and child placement plans for abuse of discretion. *In re Marriage of Kovacs*, 121 Wn.2d 795, 801, 854 P.2d 629 (1993) (trial courts must consider best interest of the child when providing for residential schedule or placement of a child, and we review rulings regarding child placement for abuse of discretion). When trial courts create permanent parenting plans, they wield broad discretion, but that discretion must be guided, at least, by RCW 26.09.187(3), .184, .002, and .191. *In re Marriage of Katare*, 175 Wn.2d 23, 35-36, 283 P.3d 546 (2012).[10]

Generally, a trial court will not modify a parenting plan "unless it finds, upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child." RCW 26.09.260(1).

Here the trial court failed to exercise its discretion. When parties stipulate to proposed changes to an already-existing parenting plan, the trial court must exercise its discretion to consider whether the plan operates in the best interest of the child. *Coy*, 160 Wn. App. 797, n.7. And when a trial court exercises its broad discretion to fashion a final parenting plan, it must

---

[10] RCW 26.09.187(3) provides factors a trial court must consider when establishing residential provisions. These include, among others, "the relative strength, nature, and stability of the child's relationship with each parent," any knowing and voluntary agreement of the parents, and the parents' and child's wishes if the child is "sufficiently mature to express reasoned and independent preferences." RCW 26.09.187(3)(i), (ii), (vi).

14

consider RCW 26.09.187(3), .184, .002, and .191. *Katare*, 175 Wn.2d at 35-36. Here, the trial court had a similar obligation.

The parties agreed the January 2023 incident had occurred since their CR 2A agreement, the parties agreed Roland had a history of physical discipline with their third child (now an adult), Lisa expressed concerns that further incidents might occur, and Lisa argued that the CR 2A agreement no longer served the best interest of their two minor children. By failing to consider what Lisa alleged to be changed circumstances, based upon undisputed events, which occurred in the interim between the CR 2A agreement and the entry of final orders, the trial court foreclosed Lisa's ability to later move for modification based on the January incident. *See* RCW 26.09.260(1) (modification requires the court to find that a substantial change has occurred based on "facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan").

Thus, because the trial court was not bound by the terms of the CR 2A agreement relating to the parenting plan (RCW 26.09.070(3)), and because a parent sought a change to the parenting plan due to an alleged change in circumstances occurring between the CR 2A and the entry of final orders, the trial court had a duty to exercise its discretion and consider the matter at a fact-finding hearing before entering a final parenting plan. Because there is no evidence in the record that the trial court did so, we vacate the parenting plan and remand for further proceedings.

D.      *Final Child Support Order*

Lisa also argues that the trial court was required to consider her changed circumstances before signing the final child support order. We disagree.

RCW 26.09.070(3) binds trial courts to the terms of a couple's settlement agreement (excluding parenting plans) while also requiring trial courts to review child support agreements for compliance with RCW 26.19.020. RCW 26.19.020 provides the current child support economic table.

Here, the trial court did not err by entering the final child support order because it complied with the child support economic table and it reflected the material terms of the CR 2A agreement. RCW 26.09.070(3) requires the trial court to review CR 2A terms related to child support, but only for compliance with the child support economic table. In the CR 2A agreement, the parties agreed to a child support obligation of $1,552 per month. The final child support order required Roland to pay Lisa a child support obligation of $1,551.76 per month. The trial court attached the child support schedule worksheet to its final order, showing that the order was properly calculated.

Lisa requested an additional $400 per month in her response to Roland's motion, but her proposed child support order reflected the same combined monthly net income as the final order and did not request a deviation from the standard calculation, nor did her proposed child support schedule worksheet show how she arrived at the amount of $400. Consequently, the trial court did not err by entering the final child support order in the amount of $1,551.76, in compliance with the law at the time.

Further, Lisa argues the trial court erred by denying her request to go to trial regarding its final child support order because the order was unfair. We disagree.

For support, Lisa cites to RCW 26.09.070(3) (terms of a settlement agreement are binding unless trial court "finds, after considering the economic circumstances of the parties and

any other relevant evidence produced by the parties on their own motion or on request of the court, that the separation contract was unfair at the time of its execution") and *Baird v. Baird*, 6 Wn. App. 587, 590-91, 494 P.2d 1387 (1972) (holding that when stipulations are "rendered inequitable by the development of a new situation," courts have discretion to relieve parties, but only if there is "a plain case of fraud, misunderstanding or mistake"). The referenced portion of RCW 26.09.070(3) applies only to agreements which were unfair at the time they were entered. Lisa does not argue that the CR 2A child support agreement was unfair at the time it was entered. Nor does she argue that it was induced by fraud, misunderstanding, or mistake, as required by *Baird*. This argument fails.[11]

Because we vacate the final parenting plan, we recognize that the trial court may decide to set a different residential schedule on remand or make other changes as appropriate. We affirm the final child support order, but our opinion in no way restricts the trial court from making any necessary changes to the child support order in accordance with changes it may make to the parenting plan. *See* RCW 26.19.075(1) (providing reasons for deviating from the standard child support calculation).

---

[11] Lisa also argues the trial court abused its discretion by denying her CR 60(b) motion to vacate. However, Lisa has not filed any supplemental designation of the record, nor does her briefing on the issue cite to the record. Because we have no record of the issue to review, we decline to consider it. *State v. Wade*, 138 Wn.2d 460, 465, 979 P.2d 850 (1999) ("Although RAP 9.10 gives the appellate court the authority to order supplementation of the record, it plainly does not impose 'a mandatory obligation' to do so.") (quoting *Heilman v. Wentworth*, 18 Wn. App. 751, 754, 571 P.2d 963 (1977)).

## II. ATTORNEY FEES

Finally, Lisa requests attorney fees and costs on appeal under RCW 26.09.140 and RAP 18.1(a). She further relies on RAP 14.2 and RCW 4.84.030 and *In re Paternity of M.H.*, 187 Wn.2d 1, 13, 383 P.3d 1031 (2016), arguing that because she substantially prevails on the issues, she is entitled to attorney fees. We grant Lisa's request for fees.

RAP 18.1(a) allows us to award attorney fees and costs "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses on review." RCW 26.09.140 grants us discretion to "order a party to pay for the cost to the other party of maintaining [an] appeal and attorneys' fees in addition to statutory costs."

Lisa argues she is entitled to attorney fees and costs because her only independent income comes from long-term disability benefits, she is unable to work, she supports LNM and LKM, both of whom have disabilities, and Roland has means to pay. Because we conclude that Lisa substantially prevails on this appeal, she has demonstrated a financial need, and Roland presents no briefing or argument to the contrary, we grant Lisa's attorney fees request.

### CONCLUSION

We hold that the trial court erred by entering Roland's proposed dissolution decree and final parenting plan but did not err by entering the final child support order. We also award Lisa attorney fees on appeal.

Accordingly, we affirm the child support order but vacate the dissolution decree and final parenting plan, and remand for further proceedings consistent with this opinion. While we affirm the final child support order, if the trial court finds it necessary to revise the order after entering a new parenting plan on remand, the trial court may do so.

No. 58745-9-II

A majority of the panel, having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Glasgow, J.

Veljacic, C.J.